IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 2, 2004

# IN RE ADOPTION OF JOHN ALLEN KLESHINSKI AND KEVIN RAY KLESHINSKI

# CHIRLENA JEAN KLESHINSKI AND JOHN EDWARD KLESHINSKI
## v.
# JULIA ELIZABETH KLESHINSKI

**An Appeal from the Chancery Court for Lincoln County**
**No. A-186     J. B. Cox, Chancellor**

---

**No. M2004-00986-COA-R3-CV - Filed May 4, 2005**

---

This is a termination of parental rights case. The mother and father were married, and two sons were born during the marriage. The father physically abused the mother during the marriage. In 1996, the parties divorced. Later in 1996, a consent order was entered giving the father custody of the children. The order did not require the mother to pay child support. Both parties remarried, and the mother moved to Alabama. The mother exercised visitation with the children until the early part of 1999. Around that time, the mother stopped visiting the children entirely. The father claimed that he did not know why the mother stopped visiting, and the mother said that the father and his new wife threatened her with physical harm if she attempted to see her sons. About four and a half years after the mother's last attempt to visit with the children, the father and his new wife filed this petition to terminate the mother's parental rights and to permit the father's new wife to adopt the children. The father and his new wife asserted that the mother had abandoned the children by willfully failing to support or visit them. The trial court terminated the mother's parental rights but declined to permit the adoption at that time. The mother now appeals. We reverse the finding of the willful failure to support and affirm the finding of willful failure to visit. However, we vacate the termination of parental rights on the basis that the trial court failed to make specific written findings regarding the best interest of the children, and remand for further proceedings on this issue.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Vacated and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., joined. ALAN E. HIGHERS, J., filed a separate concurring opinion.

Susan E. McCown, Fayetteville, Tennessee, for the appellant, Julia Elizabeth Kleshinski.

N. Andy Myrick, Jr., Fayetteville, Tennessee, for the appellees, Chirlena Jean Kleshinski and John Edward Kleshinski.

## OPINION

This case involves the unsettling aftermath of an abusive marriage. Petitioner/Appellee John Edward Kleshinski ("Father") and Respondent/Appellant Julia Elizabeth (Kleshinski) Posey ("Mother") were married in 1989 and are the natural parents of the minor children involved in this action, John Allen Kleshinski (born October 9, 1990) and Kevin Ray Kleshinski (born October 8, 1994). They lived primarily in Fayetteville, Lincoln County, Tennessee. Mother has a ninth-grade education and had worked in minimum wage jobs, mostly at factories. Father works for a blasting company, regularly working significant overtime and making a substantial income. Father was physically abusive towards Mother during the approximately seven-year marriage. Mother finally left the marital home, and the parties divorced on March 11, 1996. In the final decree, by consent, Father was awarded custody of John, and Mother was awarded custody of Kevin.

Mother was unemployed when she left the marital home, and initially had difficulty finding a job. She lived in a variety of places, first with a friend, for a short while in a motel, for several months in a trailer with a boyfriend, and then with a cousin. As a result, in December 1996, Mother signed a consent order giving Father custody of Kevin as well as John. Kevin and John were approximately two and five years old, respectively, at the time. Under the order, Mother was given reasonable visitation to be established by Father in his discretion. The consent order did not require Mother to pay child support.

Father remarried in November 1996 to Chirlena Jean Kleshinski ("Stepmother"). They continued to reside in Fayetteville, Lincoln County, Tennessee, with Stepmother's son from a prior marriage. Some of Mother's relatives, including her sister, continued to live in the same area.

At some point during this time, Mother moved to Alabama. For a couple of years, she exercised regular visitation with both children. This ended on approximately New Year's Eve 1998, for reasons that the parties dispute. She had no visitation with them after that time.

Mother married Myron Posey ("Mr. Posey") in April 1999, and for at least the next four years, she and her new husband continued to live at the same address in Alabama. Mr. Posey had been employed at a meat market prior to their marriage, but after several surgeries on his legs was unable to continue working. Mother had regular communication with her sister, Sheila Nix ("Nix"). Nix lived in the same area as Father and Stepmother and was in contact with them as well. Father's mother, Ann Jones ("Grandmother"), also remained in contact with Mother.

On February 18, 2003, Father and Stepmother filed a petition to terminate Mother's parental rights as to both children, and to permit Stepmother to adopt them. As grounds for termination, the petition alleged that Mother had "willfully failed to visit, support, or make reasonable payments toward the support of [the children] for a period of 4 months preceding the filing of this petition

and/or engaged in conduct that exhibited a wanton disregard for the welfare of the children." The petition also alleged that termination of Mother's rights was in the best interest of the children.

The petition for adoption alleged that Father had attempted to determine Mother's whereabouts and "drove to Alabama to search for [Mother] at her last known address, but was unable to locate her." Based on the claim by Father and Stepmother that their efforts to locate Mother were unsuccessful, the petitioner sought to serve process on Mother by publication in the Elk Valley Times in Lincoln County, Tennessee.

A friend of Nix's apparently saw the publication in the Elk Valley Times and told Nix, who in turn notified Mother. After learning of the petition to terminate her parental rights, on March 17, 2003, Mother sent a letter *pro se* to the Court Clerk, objecting to the termination of her parental rights and asserting that she had been unable to visit the children because Father and Stepmother refused to allow such contact and threatened her with bodily harm when she attempted to see the children. Mother filed an affidavit of indigency and counsel was appointed to represent her. The trial was set for July 8, 2003.

In the ensuing trial, the trial judge heard testimony from several witnesses. The witnesses offered widely divergent views of the marriage between Mother and Father, and the circumstances under which Mother came to lose all contact with her sons.

As the petitioners, Father and Stepmother presented their proof. Father testified first, giving sparse background on his marriage to Mother and their 1996 divorce. He noted that, initially, they agreed that he would have custody of their older son, John, and that Mother would have custody of Kevin, but several months later, Mother agreed to allow Father to have primary custody of both children. Father said that, after he obtained custody of both boys, Mother visited them only "[a] couple of times." He claimed that he offered to let Mother stay in his and Stepmother's home and visit the children there, but that she did not take advantage of that offer. He then testified as to an occasion on which Mother had the children, but they were discovered in the middle of the night in the care of two teenagers who had been drinking and passed out. When the children were found, they were dirty and Kevin was in a diaper that appeared to have not been changed for several hours.

Father testified that Mother last visited the children in February 1999, that she had not attempted to call him since that time, and that he had not received any letters from her. He did not testify as to any reason for her failure to visit their sons. Father claimed that he and Stepmother tried to locate Mother by driving to Alabama to look for her, but could not find her. Father said that Mother had never paid any support for the children since he gained custody of both of them. Contrary to the allegations in Mother's letter to the Court Clerk, Father stated, he had never told Mother that she could not come see the children, and he had "not ever threatened" Mother or in any way tried to prevent her from seeing the children. Father testified that it would now be detrimental to the children to allow Mother to come back into their lives after having been gone for so long. Father said that he and Stepmother had been married for seven years and have a great marriage. He asserted that Stepmother has a great relationship with the children and that she was the only mother

they knew. Father said that the children do not ask about Mother, and that the younger boy, Kevin, does not remember Mother at all. He maintained that he and Stepmother had the financial ability to care for the children, noting that he was making $15 an hour working for a blasting company, working substantial overtime. Father contended that it was in the best interest of John and Kevin for Stepmother to adopt them so that she would have custody in the event that something happened to him.

On cross-examination, Father again denied that he had ever threatened Mother. Father was then asked about physical abuse:

Q: You never beat her either, did you?
A: Beat her?
Q: Beat her?
A: Define beat.

Finally, Father admitted to having "hit" Mother during their marriage, but claimed that he hit her "[n]o more than she hit me." Father professed not to remember details; he allowed that he may have hit Mother "a couple of times" but did not remember whether he hit her in the head, and denied ever kicking or hitting Mother while she was pregnant. Father said that it had happened "a long time ago" and claimed, "I'm a different person now." Father admitted to having been arrested in June 1996 for the aggravated assault of Stepmother's former husband, but said that the charges were dropped. Father acknowledged that four or five years ago, Stepmother and Mother talked on the telephone and "had words," but claimed that he did not know all that was said.

Father noted that Mother had never paid child support. He denied that she offered to pay such support in order to get unimpeded visitation with her sons.

Father claimed that, after the divorce, Mother agreed to give him permanent custody of Kevin by signing the necessary papers drafted by his lawyer. He denied telling Mother that it would be a temporary custody arrangement, observing that the custody papers she signed were available for her to read. Father acknowledged that the final divorce decree provided that Mother would have reasonable visitation as determined by him. When asked about the circumstances on New Year's Eve of 1998, Father initially claimed that he did not recall the incident, and then stated that Mother was supposed to have the children, but did not get them from him. Father said that the first weekend in February 1999 was the last time he remembered Mother exercising visitation with their children. When asked about the occasion on which he and Stepmother drove to Alabama to look for Mother three or four years prior to the hearing, Father claimed that they did not find her. He denied that they drove by Mother's house, saw her get out of her car, and yelled at her to "come get her ass whipping" and made an obscene gesture toward her.

Father admitted to using marijuana "[y]ears ago" but said that he had not done so recently. He denied ever using crack cocaine, and denied ever using drugs around the children. Father said "no, it's not ever been used in my home. We've got a drug-free home."

Stepmother also testified. Stepmother said that she and Father have a good relationship, and that he is a great parent to the children. Stepmother said that she gets along well with the children, treats them as her own, and loves them dearly.

Stepmother corroborated Father's testimony that Mother's last visit with the children was in February 1999. Prior to that visit, she claimed, it had been about three months since Mother had tried to visit with the children. She said that Mother had exercised her visitation with the boys regularly until Mother's mother died in September or October 1998. At that point, Stepmother claimed, when she tried to call Mother to set up visitation, Mother's husband told Stepmother to stop trying to push the kids on Mother, and that Mother would contact Stepmother if she wanted to see the children. Stepmother said that at one time she tried to encourage visitation through contact with Mother's sister, Nix, but later stopped trying to do so.

Stepmother explained that she had known Nix prior to her marriage to Father, and said that Nix had been to her home since Mother stopped visiting the children. Stepmother denied threatening to beat or assault Mother if she tried to visit the children, but acknowledged telling Nix that Mother "deserved an ass whipping." She said that her comment to Nix was made about a year after Mother stopped visiting the children and claimed that she said it because she was angry at Mother for not exercising her visitation. Stepmother said that the children would cry because Mother did not show up to get them, and that she was left to make excuses for her. Stepmother denied making threats to Mother over the years, either directly to Mother or through others. Stepmother claimed that Mother had never called her house, and denied that Nix had ever given her Mother's telephone numbers.

Stepmother said that, on more than one occasion, she and Father drove to Alabama to look for Mother, but claimed that they did not find her. She denied driving by Mother's house, slowing down in front of the house, and yelling at her and making obscene gestures. Stepmother asserted that neither she nor Father was at fault for Mother's failure to visit the children in four and half years.

Stepmother acknowledged that she was aware that Father's mother, Ann Jones ("Grandmother"), planned to meet with Mother's lawyer about testifying at trial. She denied telling Grandmother that she had better not go to the lawyer's office, denied telling her that she had better not come to court, and denied threatening to keep Grandmother's big screen television or keep the boys away from her if she appeared in court to testify. Stepmother also denied hearing Father make such threats.

Stepmother stated that Father has never beaten her because she would not stand for it. Referring to Mother, Stepmother said, "[i]f you're stupid enough to stay in a home where you're being abused, then that's your own fault." When asked about Father's fault for the abuse, Stepmother conceded it was "his fault, too."

Stepmother denied having ever used illegal drugs, and said that Father does not use illegal drugs. She asserted that she does not allow them in her home.

When asked whether Mother had ever paid support for the children, Stepmother stated that Mother once bought John a backpack and school supplies, but that she had not paid any support since February 1999. She said that she and Father did not attempt to get child support from Mother because they did not need her child support. Stepmother asserted that it would be in the best interest of the children to terminate Mother's parental rights, and that it would be harmful to the children to allow Mother to come back into their lives at this point.

Mother was called by Father and Stepmother to testify as a hostile witness. In response to questions from counsel for Father and Stepmother, Mother said that she married Mr. Posey in April 1999, and that they had lived at the same address in Alabama since that time, approximately four years. Mother said that she has a ninth grade education. She was unemployed when she separated from Father, but managed to find full-time employment after that, mostly minimum-wage jobs at factories. After the divorce, she lived a few months with a friend, then with an ex-boyfriend for a period of time. She lived in a motel for a couple of weeks while she was unemployed, and then moved in with her cousin. After that, Mother met her current husband and began to live with him in Alabama. Mother said that she currently has a job at C.S. Flag Company earning $6.70 per hour. Her husband, Mr. Posey, was unable to work and was seeking disability benefits.

Mother acknowledged that she voluntarily gave custody of Kevin to Father and Stepmother, but said that she thought at the time that it was a temporary arrangement. When Father's counsel showed Mother the consent order, Mother admitted that the order did not say that the grant of custody to Father was temporary. She said that she had read the parties' agreement, but claimed that there were some things in it that she did not understand. Several months after she signed the consent order, Mother learned from Father that the order in fact gave him permanent full custody of both children. Later, when she was denied visitation, she called about eighteen lawyers in Alabama and at least one lawyer in Tennessee to try to obtain visitation rights. Mother said that she did not have the money to hire a lawyer, and could not find one who would work with her on payments. From her telephone conversations with all of these attorneys, Mother concluded that she could not afford to hire a lawyer.

Mother admitted that she had not paid support for the past four and a half years. She claimed that she had offered support money to Father and Stepmother and that they rejected her offer, saying that they did not want her money. Mother indicated that she was still willing to pay child support.

Mother admitted as well that she had not seen her children for four and a half years. She asserted that she did not visit because Father and Stepmother "had threatened me, and I knew my ex-husband had beaten me, and I was scared to go after these threats."

Mother recounted an incident in which Stepmother got in her car and chased Mother down the street. Mother said that she tried to call Father and Stepmother sometime in 1999 or 2000, maybe a couple of years prior to the trial, but that phone number had been disconnected. Mother reiterated that she was afraid to go to their house because they had threatened her and because Father had hit her before. When asked whether Father or Stepmother had done anything in the past year

to keep Mother from visiting, Mother responded that they had not.  Mother maintained, however, that she was "scared to go and try and see my children because of the physical harm that they had threatened on me."  Mother conceded that she did not know where the children went to school, since Father and Stepmother had moved.  When asked why she had not contacted the school system to get this information, Mother said that she was unaware that she had a right to obtain the information.

Though Mother maintained that Father was a bad person during their marriage, she said that he was not bad enough that she would not agree to give him custody of the children.  She explained, "he got better afterwards."  Mother agreed that "[h]e was a good father."  Mother said that she believes that the children are being well taken care of and that they are in a good home.

When asked whether the boys would know her after not having seen her for four and a half years, Mother replied, "I hope they do."  When asked whether it was in the children's best interest for her to re-enter their lives, Mother said, "I think my children need to know their biological mother, yes, I do."

Mother was then examined by her own attorney.  Under direct examination, she described her marriage with Father.  Mother said that Father would go out and drink, come home, and beat her.  The abuse began early in the marriage:  "He beat me on our first anniversary because I was dressed up to go out and he come home drunk. . . .  I took a sip of wine, wasn't supposed to, he's the one that told me to be ready to go when he got – when he got home."  During their seven years of marriage, Mother said, Father hit her at least two or three times a week.  She said that Father hit her sometimes with a closed fist, other times with an open hand, frequently in the face and in the head.  When she was pregnant with their oldest son John, she said, Father kicked her in the ribs and hit her.  Mother said that Father told her that, if she filed charges or even if she went to the hospital for medical attention, the consequences would be even worse.  She testified that Father also used marijuana and crack; while she was pregnant with John, a friend of Father's lived with them and furnished Father with crack.

Mother said that her marriage to Father got particularly bad when the couple was living in South Carolina and Father cheated on her.  She said that Father would spend time at a girlfriend's house, and then come back to her home to visit with their son John and sleep on the couch.  He beat her even when they were separated, and threatened that if she were to take John out of the State of South Carolina, he would kill her.  She said that he threatened her in that way many times, and she believed the threats.

Mother said that, just after the divorce, she exercised visitation with the boys regularly.  She had custody of the boys every other weekend, and on other occasions when Father needed her to keep the children.  Mother was asked about the incident described by Father in which, while Mother had weekend visitation, the children were found in her cousin's house in the custody of two drunk teenagers.  Mother admitted to the incident, stating that she was living with her cousin at the time.  Mother claimed she did not know where the teenagers obtained the liquor.

Mother described the episode on New Year's Eve 1998. She said that Father asked her to keep the boys on New Year's Eve because he had expensive tickets for an event and he and Stepmother intended to go out. Mother told Father that she and her husband had already made plans. She said that Father then told her that if she did not get the kids right then, he would not let her see them anymore.

Thereafter, Mother testified she received information from several different people who were in contact with Father and Stepmother that if she went to visit the children she would "get the ass whipping I deserve." Even before the New Year's Eve incident, Mother said, she felt threatened because frequently when she visited, there would be an argument with Father. Since New Year's Eve, she said, the threat of an "ass whipping" was the consistent response that she got anytime she attempted to see the children.

Mother said that she sent messages to Father and Stepmother through her sister, Nix, in an attempt to visit with the children, but Father and Stepmother would not allow that. She said the threats of violence had always been there, and that she was made aware of the threats by Nix as well as Grandmother, Father's mother. Mother said that she called many lawyers in Alabama and Tennessee to try to get visitation with the boys. She said that the lawyers told her that, since the consent order provided that her visitation was in Father's discretion, Father could keep her from seeing her sons. Mother again said that she told Father and Stepmother that she would pay child support, trying to keep her visitation, but that Father and Stepmother refused to accept her money because they did not want her to have the right to visit with the children. Mother claimed that she did not know that she had the right to pay support to the court for the children.

Mother said that she told Father where she was living in Alabama when she moved there. She gave him the name of the street, but not the number, because she did not have it at that time. She described the incident in which Father and Stepmother drove to the house in Alabama that she shared with her husband for four years. She said that they drove by while Mother was in the driveway, blew the horn and through the open window, flipped her the bird, and yelled at her. She said that the car passed by her house two or three times that day. Mother said that she tried to get them to stop so that she could ask them about the children. Father, however, would not stop the car.

Based on that incident, Mother said, it was clear that Stepmother and Father knew where Mother lived, contrary to their claim in his petition for adoption. Moreover, Mother said, she has a good relationship with Grandmother, Father's mother, and Grandmother has stayed in contact with her over the years. Mother said that Grandmother had written her several letters, and Mother had kept some of those letters. Despite all of these contacts, Mother said, she learned of Father's petition to terminate her parental rights because Nix was informed about the notice in the Tennessee newspaper and told her about it.[1]

---

[1]Indeed, paragraph 23 of the petition to terminate Mother's parental rights states that Mother was "last believed to be living in *Alabama*." Despite this, counsel for the petitioners arranged for service by publication in the local newspaper in Lincoln County, *Tennessee*, where Father and Stepmother lived. This seems to be inexplicable,

Mother said that it is very difficult to not see her children, and states that she cries every night because she cannot see the children. She said that she had been taking "antidepressants and nerve pills trying to deal with the hurting of not being able to see my kids." The summer before the trial, Mother said, she even drove to Tennessee and sat in the car down the street from Father's house to watch her sons play.

Mother again was asked why she had not tried to see the children in the past several years, and Mother replied that she was "scared to go to their house, and I didn't have the money for an attorney, and they had threatened me before."

When asked why she did not simply go see the children and suffer the consequences of being beaten by Father, Mother replied that the children did not need to see that. She stated her belief that Father was fully capable of killing her. Mother said that the last threat she received through a third party from Father and Stepmother was made less than a year prior to the hearing. In response to her request, Mother said, Nix promised to talk to Father and Stepmother to see whether Mother could see her sons. Nix reported back to Mother that "they said I could see my kids when I come up there and got the butt whipping I deserve." Mother said that was the consistent response to every such inquiry.

The trial judge asked Mother several questions at trial:

THE COURT:     After that divorce decree but before this blowup that relates in some fashion to the New Year's Eve holiday, were there visitation periods when you had both boys and when he had both boys?

[MOTHER]:       Yes, sir.

THE COURT:     Were you able to visit unmolested without the fear of threat?

[MOTHER]:       Yes, sir.
                * * * *

THE COURT:     Well, I think the theme of your testimony has been your fear was that he was going to beat you. I want to know how long you exercised visitation between the time of your divorce and the time this new fear about him beating you developed.

[MOTHER]:       Maybe a year or so. He had threatened, you know, on the phone and stuff, but he had threatened.

THE COURT:     So, you went for a period of at least a year having reasonable visitation with this man that beat you all this time?

[MOTHER]:       Yes.

---

particularly for an action as serious as termination of parental rights. Moreover, the petition states that Father and Stepmother were in touch with Mother's family and they were "unaware of her location." As seen by Nix's testimony, even a cursory investigation by the petitioners' counsel would have revealed Mother's address.

| | |
|---|---|
| THE COURT: | And then it just blew up? |
| [MOTHER]: | Yes. |
| THE COURT: | And it blew up over New Year's Eve visitation because both of y'all had plans? |
| [MOTHER]: | Yes. |
| THE COURT: | And that was the last real time you've had meaningful residential sharing with your sons? |
| [MOTHER]: | Yes. |
| [THE COURT]: | And that's been more than four years ago? |
| [MOTHER]: | Yes. |
| | * * * * |
| THE COURT: | I'm going to ask you a hard question. Even if the threat was conditional, why didn't you do it over a four year period for the sake of your children even if they were going to see something bad? |
| [MOTHER]: | Do what? |
| THE COURT: | Why didn't you go visit with your children even if there was the potential for them to see something bad that you didn't think that they should see? Why didn't you at least step out and take the chance? |
| [MOTHER]: | I was scared. |
| THE COURT: | So, I understand your order of priority in your life is that your fear for your own physical safety outweighed your desire to see your children? |
| [MOTHER]: | No. |
| THE COURT: | All right. Explain that to the court. Explain to me why it did not. |
| [MOTHER]: | I love my kids. I'd do anything in this world to be able to see them, and I – and I would then and I'll do it now. |
| THE COURT: | Did you hear the answer you just gave? I love my kids and I'll do anything in this world to see them. That is not in fact true, is it? |

When Mother was asked whether she was fearful that the children were being abused as she had been, Mother said that she did not know, but she had not seen any bruises on the children before. The trial judge asked Mother whether she had reached a point in her life where she had given up on seeing the children, and Mother replied that she had gotten to the point where she did not know what else to do.

Nix also testified at the trial. Nix stated that she lives in Tennessee, and has a pretty good relationship with Mother. She described Mother as a very shy, quiet person who does not want trouble. Nix said that she maintained her relationship with Mother throughout her marriage to Father, and that she visited their home during the marriage. Nix testified that she is also a friend of

Stepmother, and said that she had visited Father's and Stepmother's home since Father and Mother divorced. She said that she had not talked to Father or Stepmother for seven or eight months prior to the trial.

Nix testified that she was aware during their marriage that Father abused Mother. She said that the couple lived with her for three to four months while they were married. Nix described one occasion on which she witnessed such abuse: "Well, Julia [Mother] left grease on the dishes, and John [Father] had called her over there, and Julia said what is it, and he said look at the grease on these dishes, feel this. When she did, he slapped her." Nix said that she told Father that she would not tolerate him hitting Mother in her house. Nix said that, on another occasion, she saw Mother with a black eye. Mother made excuses at the time but, after they separated, Mother told her that Father had hit her. Nix said that Mother is scared of Father and always has been.

Nix said that Father told her he knew where Mother lived. She said that Father told her that he and Stepmother rode by Mother's house and "flipped her the bird" and tried to get her to come outside. Nix said that Father knew exactly how to get to Mother's house; using Father's directions, Nix went to Alabama and saw Mother.

Nix said that she was willing to be a go-between to enable Mother to see her sons. At one point, Nix said, Mother asked her to give Father and Stepmother her telephone numbers, indicating that she wanted them to call her about having visitation with the children. Nix gave the telephone numbers to Stepmother, who then put the numbers on her refrigerator. At that time, Nix claimed, "Chirlena [Stepmother] told me that Julia could see the kids anytime she wanted to but she was going to get her butt whipped when she did come to see them." Nix agreed that these threats were consistent anytime she attempted to work out any kind of visitation on behalf of Mother. Nix testified that she was sure there would be trouble if Mother attempted to visit the children.

Nix said that it had been two years since she had talked with Father and Stepmother about permitting Mother visitation with the children. She said that Mother had more recently asked her how the kids were doing, but she did not pursue visitation at that time. Nix said that Mother told her that she has not visited the children because she is scared of Father and Stepmother. Nix says that she is still friends with Father and Stepmother and that they are good parents to both of the boys. She said that the children treat Stepmother as their mother. Nix said that Mother had not given up on the children, and that she held out hope that someday she would be able to see them. She had asked Nix for pictures of the children, and Nix had sent her some.

Mandy Honea, Mother's niece, testified about an incident that indicated the abuse that Father inflicted on Mother during their marriage. She said that for a time she lived with Father and Mother when they lived in Tennessee, and that she visited them when they lived in South Carolina. During a time in Father's and Mother's marriage in which Father and Mother were living with Honea's parents, Father thought Honea was Mother, and he slammed her head in a door. She said he slammed the door on her head so hard that her head became stuck in the door and her husband had

to help her get out of it. Honea said that, when Father realized that she was not Mother, he could not apologize enough. Honea added that she had seen Father smoking marijuana.

Honea maintained a good relationship with Mother, and also had spoken to Father and Stepmother about permitting Mother to visit her sons. A little over a year before the trial, Honea said, she had a discussion with Father and Stepmother about Mother seeing the boys. She said that both Father and Stepmother told her that if Mother wanted to see the children, "she was going to get her ass whipped first." When Honea was asked whether Mother was scared of Father, she replied, "She should be. After all the abuse that she took. . . ."

Honea also recalled the incident in which the two children were found in the care of two teenagers when Mother had visitation. Honea said that her sister, under twenty-one years old at the time, was babysitting the children on that occasion. Honea said that her sister had been drinking, but maintained that the children were not in an unsafe environment. Honea called Father and Stepmother to let them know that Kevin's diaper had not been changed since he went to bed earlier that night.

Despite this, Honea said, Father and Stepmother are good parents. She said that the children treat Stepmother as their mother, and that they know no other mother.

Father's mother, Grandmother, testified at the trial on behalf of Mother. Grandmother said that she had maintained a good relationship with Mother since the divorce. Grandmother said that she knew of one occasion during Father and Mother's marriage on which Father had physically abused Mother:

Q:  Okay. What do you know?
A:  I know that I went over there to see [Mother] and [Father], and the kids, and her whole face was black and blue. And I asked her what happened, and she acted like she was scared, and she told me that she'd run into the refrigerator. Later she told me that [Father] beat her up like that.
Q:  And did she tell you how often that happened?
A:  She told me he hit her almost every day.

Grandmother said that Father and Stepmother told her that they had driven by Mother's house in Alabama and that Mother was in the yard. Grandmother also said that Stepmother told her that if Mother tried to see the kids that she would "stomp her behind." Grandmother testified that she had also heard Father say that he would do the same thing to Mother's husband. Grandmother said that she believes that Mother is afraid of Father and Stepmother, and she also believes that if Mother tried to see the children, there would be trouble.

Grandmother acknowledged that she wrote letters to Mother encouraging Mother to continue having a relationship with the children. Grandmother recalled sending a letter to Mother telling her that she was sorry that Stepmother and Father had "brainwashed" the children, and predicting that

they would get what they deserved for treating her this way. Grandmother told Mother that Father and Stepmother were "brainwashing" the children because Kevin had told Grandmother that all he remembered about Mother was that she had yellow hair and that she drank wine coolers. Grandmother surmised that, because Kevin was only three years old at the time he last saw Mother, he could not remember that Mother drank wine coolers unless Father and Stepmother had told him that. In other letters Grandmother wrote to Mother, she urged her to not give up on the children and assured Mother that she would let the children know that she cared about them. She said that she wrote: "Julia, one day they will come hunting you. I will tell them you love them. Also I will tell them the reason you don't come to see them is because [Stepmother] and [Father] threaten[] to beat you up . . . if you come up there. In time I will tell them." Grandmother testified that Father asked her not to write Mother anymore, but she nevertheless continued to do so.

Grandmother testified that, one Christmas, Mother was going to give her some money to give to her sons for Christmas. Grandmother said that Father told her she could not accept it "because he didn't want her giving the kids nothing." So she did not accept that money from Mother.

Grandmother said that she moved to Tennessee a little over a year prior to the trial in order to be closer to her grandchildren. She commented that she had been unable to see the children because her car was in disrepair and she could not visit at will. She said that she occasionally spent the night with Father and Stepmother, but she had not done so since the prior December. On one occasion, Grandmother testified, Father and Stepmother had a party and Grandmother saw Stepmother's brother on the couch in Father's home smoking marijuana.

Grandmother testified that she bought a set of bunk beds so that the children could spend the night with her, but said that they had never been permitted to come over. Grandmother suspected that this was because Father and Stepmother were worried that she would permit Mother to see the children.

Grandmother testified that when she told Father and Stepmother that she had an appointment with Mother's attorney, Father told her to call and cancel her appointment. Grandmother said that Father and Stepmother told her that they had "an open and shut case, and that they didn't need witnesses." When Grandmother asked Father to bring her big screen television set to her home, she claimed, Father told her that it depended on how the hearing went as to whether he would bring it to her. Thus, Grandmother claimed that Father threatened to keep her television set depending on her testimony at trial. Grandmother said that she testified despite the threats because she was concerned about her grandchildren and believed that they ought to be able to see Mother, and that Mother ought not be put in fear in order to see her sons.

Father testified at trial a second time. He said that he did not threaten his mother, nor did he attempt to bribe her in anyway regarding her testimony.

At the conclusion of the hearing, the trial court discussed the proof and its assessment of the parties' credibility. The trial court stated:

The court is faced with difficult questions of credibility in this case, most disturbing and difficult questions of credibility in this case, and the court believes that it should be disturbed on both sides based on that credibility issue because neither side's testimony completely will fit — will fit through the strainer of truth in this case. I find it very unlikely that given the amount of information that Ms. — Mr. Kleshinski's mother has of this situation that he did not know of the whereabouts of this lady for this period of time. I also find it equally unlikely that this lady who enjoyed visitation with her sons post-divorce but prior to some New Year's Eve breakup and from then on I'm going to whip, pardon the court's language, ass is equally unbelievable in this case. Either the threats were and this man was threatening entirely throughout the entire time and discouraging visitation and continuing threats and making sure that he could – that she could not see the children or he was not. By her own admission she enjoyed visitation during a period of time post-divorce before this blowup occurred. That does not strain very well either. It is a most compelling excuse against willfulness, but it doesn't hold water, and in that regard the court does not know that it even has to reach it.

* * *

The court also believes that the last meaningful attempt at visitation occurred more than two years prior to the filing of the petition. The court is not at all convinced that the willful standard that is statutorily mandated is to be taken by the court as a subjective standard and only to be relied upon by the court in the mind of the person whose rights are potentially to be terminated. The court believes that that standard for willfulness statutorily and otherwise should be interpreted as an objective standard and that objectively her inaction constitutes willful abandonment for that reason as well.

The trial court also concluded that Mother's failure to financially support the children was willful, noting that her obligation to support was not contingent on seeing the children and therefore was not prevented by any threats of physical harm. The trial court determined that Mother's attempt to give money to the children at Christmas was token support only.

In addition, the trial court made the following findings:

The court has considered in viewing the standard that [Mother] has a ninth grade education. The court has considered that even given that ninth grade education she took steps consistent with contacting 18 attorneys licensed in the State of Alabama and at least two attorneys licensed in the State of Tennessee in an attempt to do something about her situation but that attempt occurred more than four months prior to the filing of the petition for termination of parental rights. The court finds it highly unlikely that she would have received advice that she could not have addressed the court even if she could not have afforded counsel given the number of attorneys that she discussed the matter with. And the proof that she may have received that type of information is consistent with the fact that Ms. Fraley [one of

-14-

the Tennessee attorneys], who is not in this case, advised her to inform the court of her position in this case.

Thus, in its oral ruling on the grounds for termination, the trial court appeared to not entirely credit or discredit the testimony of Father and Stepmother, on one hand, or Mother on the other hand. It discredited the assertion by Father and Stepmother that they did not know where Mother lived during her four or more years in Alabama and when they filed the petition to terminate. It found that Father was physically abusive to Mother during their marriage and noted Stepmother's admission of the "ass whipping" remark. The trial court found "unbelievable," however, Mother's contention that the threats were "continuing" during the over four years Mother did not visit their sons. The trial court apparently credited Mother's testimony that, during the period of non-visitation, she contacted numerous attorneys "in an attempt to do something about her situation . . . ." It found implausible, however, Mother's testimony that none of these attorneys advised her to contact the court directly even if she could not afford an attorney. The trial court also noted that Mother's contact with the attorneys did not occur within the pivotal four-month period prior to the filing of the petition to terminate. The trial court emphasized that it interpreted "willfulness" according to an objective standard rather than a subjective standard. Given all of the circumstances surrounding Mother's non-visitation, the trial court concluded that Mother's actions were insufficient, finding "that objectively her inaction constitutes willful abandonment . . . ."

The trial court also found no justification for Mother's failure to pay child support, finding that such payments were not prevented by threats of physical harm. Accordingly, the trial court concluded that Mother had abandoned the children by willfully failing to visit and willfully failing to pay support.

The trial court did not make an explicit finding that the termination of Mother's parental rights was in the best interest of the children. Indeed, the trial court stated that it was not convinced that adoption would be in the children's best interest. The trial court reasoned:

> [T]he court is not convinced currently that adoption is in the best interest of the minor children . . . . There has been by the admission of [Father] in this record of prior acts of physical violence against his former wife. There has been in this record admission by [Stepmother] that regardless of the situation she has made extremely derogatory remarks about the biological mother of these children, including those remarks where she said she deserved the proverbial ass whooping. The court needs to determine whether it should based on the best interest of these young men proceed with the adoption and will waive no statutory requirements in this case.

The trial judge observed that often times "it has to make decisions that it would not morally or otherwise agree with. This is one of those situations."

On August 15, 2003, before the trial court entered a final order in the matter, Mother filed a motion to reopen the proof based on newly discovered evidence. The motion asserted that on

August 2, 2003, while the children were in the care and custody of Stepmother's mother, Cindy Stamper ("Stamper"), at her home next door to the home of Father and Stepmother, Stamper was arrested for possession of marijuana in the presence of the children. Mother's motion further alleged that on August 3, 2003, Stepmother was arrested as well and charged with possession of marijuana, and that this occurred in the presence of the children while the children were in Stepmother's care and custody. Mother noted that she had questioned the credibility of both Father and Stepmother at the trial, specifically with respect to their drug use in and around the children, and that the trial court had observed in its oral ruling that credibility was central in determining the issues presented. Thus, in light of the new criminal charges pending against Stepmother and Stamper, Mother requested that the trial court hold its final judgment in abeyance in order to consider evidence regarding the drug charges, so as to protect the best interest of the children.

On August 19, 2003, the trial court entered a written order granting the petition to terminate Mother's parental rights. The order did not address Mother's motion to reopen the proof. The trial court concluded in the order that Father and Stepmother had proven by clear and convincing evidence that Mother had abandoned the children by failing to visit or support the children within a period of four months prior to the filing of the petition. The trial court found that Mother did not visit or support the children for four and a half years preceding the filing of the petition, and that she made no effort to visit for two years preceding the filing of the petition. The trial court found that the attempted payment of support through Grandmother around Christmas 2002 was token support at best. The trial court did not make an explicit finding regarding the children's best interest. Nevertheless, on those grounds, the trial court concluded that Father and Stepmother "have proven all the necessary elements for termination of said parental rights." Apparently *sua sponte*, the trial court enjoined Father and Stepmother from denying Grandmother visitation with the children, though it is not apparent in the record that Grandmother ever requested such relief. The trial court continued its final determination of the request for adoption pending the home study, the six-month waiting period, and the order of reference normally required in adoption proceedings.

On October 20, 2003, having never been heard on her motion to reopen the proof, Mother filed a motion to alter or amend the judgment or, in the alternative, for a new trial. In that motion, Mother requested that her previous motion be treated as a motion to alter or amend pursuant to Rule 59.02 of the Tennessee Rules of Civil Procedure. On November 26, 2003, the trial court granted Mother's motion "for the limited purpose of determing [sic] whether the criminal conduct of [Stepmother] and [Father] affects the issue of credibility of the witnesses [who] testified at the hearing on July 8, 2003."

On March 2, 2004, the trial court held a hearing and considered additional evidence. The appellate record includes no transcript of that hearing.[2] On March 15, 2004, the trial court entered an order of guardianship in favor of Father and Stepmother. On April 12, 2004, the trial court entered an order denying Mother's motion to alter or amend, stating that "no additional proof has

---

[2]The record includes only a photograph of two marijuana plants marked as Exhibit No. 1 at the March 2, 2004 hearing.

been presented that would affect the courts [sic] judgment as to the credibility of the Petitioners." Thus, the trial court held that the termination of Mother's parental rights as set out in the August 19, 2003 order remained in full force and effect. From that order, Mother now appeals.[3]

Mother argues that the trial court erred in determining that Father and Stepmother had established by clear and convincing evidence that grounds existed for termination of her parental rights. She contends that the evidence did not show that her failure to support was willful, because she was never ordered by a court to pay such support, because the consent order in her divorce did not require the payment of such support, and because her offers to pay support to Father and Stepmother were rebuffed. In addition, Mother argues that the evidence did not show that her failure to visit the children was willful, because the threats of physical harm from both Father and Stepmother prevented her from visiting the children. Furthermore, Mother notes, the trial court did not make specific findings of fact in determining the best interest of the children. Even if a best interest finding is implicit in the trial court's order, Mother argues, the trial court erred in concluding that terminating her rights was in the children's best interest.

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tennessee Code Annotated § 36-1-113(l)(1)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

By statute, one who seeks to terminate a biological parent's parental rights must establish two things. Tenn. Code Ann. § 36-1-113(c) (Supp. 2004).[4] First, the petitioner must prove the existence of one of the statutory grounds for termination enumerated in Tennessee Code Annotated § 36-1-113(g). Second, the petitioner must prove that terminating the biological parent's rights is in the

---

[3]On May 2, 2004, the trial court declared Mother to be indigent for purposes of this appeal, and the requirement of filing an appeal bond was waived.

[4]That statute provides:

(c) Termination of parental or guardianship rights must be based upon:
(1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c) (Supp. 2004).

child's best interest, considering the factors listed in Tennessee Code Annotated § 36-1-113(i).[5] *See* Tenn Code Ann. § 36-1-113(c)(1), (2) (Supp. 2004). Because of the importance of the constitutional interests involved, the statute requires that both grounds for termination and the best interest of the child be proven by clear and convincing evidence.[6] ***See In re J.J.C. (State v. Calabretta)***, 148

---

[5]The non-exclusive list of factors to be considered in determining whether termination of parental or guardianship rights is in the best interest of the child is as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2004).

[6]It is unclear why the concurrence in this case questions application of the "clear and convincing" standard of proof to the best interest analysis. First, it was not an issue in the trial court below, and is not raised as an issue by either party to this appeal. Second, while the statute may be "somewhat inartfully drawn," the best interest subsection of the statute "must be considered along with the preceding subsection which does use" the "clear and convincing" language. *White v. Moody*, No. M2000-10778-COA-R3-CV, 2001 WL 537160, at *1 n.1 (Tenn. Ct. App. May 18, 2001). Third, the Tennessee Supreme Court has stated that the "clear and convincing" evidentiary standard applies to the best interest prong of the termination statute:

> To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence" is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

*In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This reasoning is not in the least undermined by the language in

S.W.3d 919, 925 (Tenn. Ct. App. 2004); *In re M.J.B.*, 140 S.W.3d at 653. The statute sets forth the "legal framework" for a petition to terminate parental rights:

> The threshold issue in every termination case is whether the parent whose rights are at stake has engaged in conduct that constitutes one of the grounds for termination of parental rights in Tenn. Code Ann. § 36-1-113(g). If the answer is "yes," the trial court must then determine whether the child's interests will be best served by terminating the parent's parental rights. If the answer is "no," the court should proceed no further and should dismiss the termination petition.

*In re Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524 at *11 (Tenn. Ct. App. Nov. 25, 2003).

The "clear and convincing" evidence standard is a heightened standard of proof, which is more exacting than the "preponderance of the evidence" standard, yet does not require the certainty of the "beyond a reasonable doubt" standard. *Means*, 130 S.W.3d at 54-55. It "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re J.J.C.*, 148 S.W.3d at 925 (quoting *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn Ct. App. 1995)). Clear and convincing evidence produces in the mind of the fact-finder a firm conviction in the truth of the assertions sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

In addition, the statute requires the trial court to "enter an order which makes specific findings of fact and conclusions of law" in order to facilitate appellate review and promote a just and speedy resolution of any appeal. Tenn. Code Ann. § 36-1-113(k) (Supp. 2004); *see In re M.J.B.*, 140 S.W.3d at 653-54. When the trial court fails to comply with the requirement to include specific findings of fact in its order, the appellate court "must remand the case with directions to prepare the required findings of fact and conclusions of law." *In re M.J.B.*, 140 S.W.3d at 654; *see also State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 WL 239759, at *8 (Tenn. Ct. App. Feb. 9, 2004) (remanding to trial court for specific findings regarding the children's best interest).

---

*In re D.L.B.*, 118 S.W.3d 360, 368 (Tenn. 2003), cited by the concurrence, particularly since the applicability of the clear and convincing standard to the best interest analysis was not an issue in *D.L.B.* Finally, as acknowledged by the concurrence, there is a long line of cases stating that the clear and convincing evidentiary standard applies to both prongs of the termination statute, and the concurrence cites *not one* to the contrary. *See, e.g., State v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005); *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *4 (Tenn. Ct. App. July 26, 2004); *In re D.L.L.*, No. M2003-02736-COA-R3-PT, 2004 WL 1655990, at *4 (Tenn. Ct. App. July 22, 2004); *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004); *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 W.L. 865840, at *18 (Tenn. Ct. App. Apr. 21, 2004); *In re D.M.*, No. M2002-01317-COA-R3-JV, 2003 WL 367240, at *3 (Tenn. Ct. App. Feb. 20, 2003); *State v. Daniels*, No. M2001-00624-R3-JV, 2002 WL 31319752, at *6 (Tenn. Ct. App. Oct. 16, 2002); *In re C.L.H.*, No. M2000-02799-COA-R3-JV, 2001 WL 605101, at *3 (Tenn. Ct. App. 2001).

In light of the heightened "clear and convincing" standard of proof required at the trial court level, the appellate standard of review is modified:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.

*In re M.J.B.*, 140 S.W.3d at 654 (citing cases). Thus, giving appropriate deference to the trial judge's determinations of credibility, the trial court's findings of fact are presumed correct, unless the evidence preponderates otherwise. *Id.*; *see In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (noting that trial judge's determination on credibility issues must be given considerable deference). The appellate court "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *In re Muir*, 2003 WL 22794524, at *7 n.4 (citing *In re Valentine*, 79 S.W.3d at 548-49; *Jones v. Garrett*, 92 S.W.3d at 838). Each case must be decided based on "individualized decision making," considering the facts in that particular case. *In re Swanson*, 2 S.W.3d 180,188 (Tenn. 1999).

At the outset, we should note that, under Tennessee Code Annotated § 36-1-113, Father does not have standing to seek the termination of Mother's parental rights. *See Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004). Thus, we must dismiss the petition insofar as Father seeks such relief. Nevertheless, since Stepmother has standing under the statute to seek the termination of Mother's parental rights, this does not affect our analysis or the outcome of the appeal.

In the instant case, Mother's parental rights were terminated based on the trial court's finding that she had abandoned the children. *See* Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2004). The term "abandonment," is defined in Tennessee Code Annotated § 36-1-102 as follows:

> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have ***willfully failed to visit or have***

> *willfully failed to support* or have willfully failed to make reasonable
> payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2004) (emphasis added). The requirement that the failure to visit or support be "willful" is both a statutory and a constitutional requirement. *See In re Swanson*, 2 S.W.3d at 188; *see also In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). "The concept of 'willfulness' is at the core of the statutory definition of abandonment." *In re Muir*, 2003 WL 22794524, at *4. In the context of the statute governing termination of parental rights, the term "does not require the same standard of culpability required by the penal code . . . [n]or does it require malevolence or ill will." *Id.* at *5. To be "willful," the conduct must be "the product of free will rather than coercion;" a person is deemed to act "willfully" if he is a "free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.*

We first address Mother's argument that the trial court erred in determining that Stepmother had carried her burden of establishing by clear and convincing evidence that Mother willfully failed to support her children during the four months prior to the petition filed in this case. It is undisputed, of course, that Mother made no payments toward support of the children; however, "simply proving that she did not support her children is not sufficient to carry this burden." *In re M.J.B.*, 140 S.W.3d at 655. A parent's failure to make payments toward the support of their child is "willful" when he or she "is aware of his or her duty to support, has the capacity to support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *Id.*; *In re J.J.C.*, 148 S.W.3d at 926 (employing the standard as set out in *In re Muir*); *see also In re S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004) (noting that the "willfulness" analysis in *In re Muir* has been employed in other cases). A parent's failure to support his or her child because he or she is financially unable to do so does not constitute a willful failure to support. *In re Muir*, 2003 WL 22794524, at *5 n.7 (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995)).

In early American common law, the duty of parents to support their children arose out of a moral obligation, not a legal one. *See In re Jones (Jones v. Jones)*, No. M2004-00173-COA-R3-CV, 2004 WL 2973752, at *5 (Tenn. Ct. App. Dec. 22, 2004). As the case law developed over time, it became generally recognized under the common law that parents have a legal obligation to support their children. In Tennessee, biological parents are expected under the common law to understand, even in the absence of a court order, that they have an obligation under the law to support their children if they have the ability to do so. *Smith v. Smith*, 728 SW.2d 738 (Tenn. Ct. App. 1987) (recognizing that parents have a common law and statutory duty to support their children); Tenn. Code Ann. § 34-1-102(a) (2004).

However, "when parents no longer have custody of their children, the nature and extent of their duty may be defined and controlled by external factors other than the parents' ability to support." *In re M.J.B.*, 140 S.W.3d at 655. In such a case, the parents' obligation to provide support can be defined in a court order or, when a child has been placed in State custody, in a permanency plan. *Id.*

If the biological parents are divorced, as in this case, their parental rights and responsibilities are impacted and frequently apportioned by court order. Their right to access their children may be limited, for example, by a divorce decree which sets forth a residential parenting schedule. The concomitant responsibilities, including the responsibility to financially support the children, may likewise be allocated between the two parents.

Although referred to frequently in the testimony, the divorce decree between Father and Mother and the subsequent consent order giving permanent custody of both children to Father are not included in the appellate record. From the testimony, however, it is undisputed that neither require Mother to pay child support to Father. Perhaps this was because Mother is clearly financially challenged, making barely subsistence wages at factory jobs, or perhaps it was because the consent order gave Mother no standard visitation, only "reasonable visitation" in Father's discretion. Whatever his reasons at the time, Father clearly waived any right to receive child support from Mother.

Under these circumstances, were this a lawsuit by Father to collect back child support from Mother, we would likely be constrained to hold that, in order to collect child support from Mother, Father would be required to obtain modification of the consent order. Even then, he would be expected to obtain at most prospective relief.

Moreover, there was not any testimony from Father, or from Stepmother, that either of them *asked* Mother to pay child support. To the contrary, the testimony was that any offers of money and gifts from Mother were rebuffed by Father and Stepmother, apparently based on the widely-held misconception that if they accepted any remuneration from Mother, she would then be entitled to visitation. ***See In re Menard (Menard v. Meeks)***, 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000) (reversing termination for failure to support when the mother and her family refused to cash a check written by the father and "did everything they possibly could to prevent him from" establishing a relationship with the child); ***In re K.S.O.H.***, 2001 WL 1173302, at *7 (affirming conclusion that the father's failure to support was not willful when the mother would not accept money offered by him).

Thus, under the unique circumstances of this case, there has been no showing that Mother in fact *had* a duty to pay child support to Father for their two sons. It would be ironic indeed if, in such a situation, Stepmother could then obtain the termination of Mother's parental rights for willful failure to pay such child support to Father during the four months, or for that matter the four years, preceding the petition. ***See Hickman v. Hickman***, No. E2000-0927-COA-R3-CV, 2000 WL 1449853, at *2 (Tenn. Ct. App. Sept. 28, 2000) (where mother was under no court order requiring support, and father never asked her to pay support, mother's failure to pay support was not willful). Therefore, the trial court's conclusion that Mother abandoned her children by willfully failing to support them must be reversed.

Mother next argues that the trial court erred in finding that Stepmother had established by clear and convincing evidence that her failure to visit the children was willful. It is undisputed that Mother did not visit the children for well over the four-month statutory time period prior to the filing

of the petition for termination. However, she claims that her failure to visit was not willful, because Father and Stepmother prevented her from exercising her visitation, and specifically that they threatened her with physical harm if she tried to do so.

The conduct of the custodial parent or a third party does not excuse a biological parent's failure to support or visit unless that conduct either prevents the parent from performing his or her duty or amounts to a significant restraint or interference with the parent's effort to support or develop a relationship with the child. *In re Muir*, 2003 WL 22794524, at \*5; *see In re K.S.O.H.*, No. E2001-00055-COA-R3-CV, 2001 WL 1173302, at \*7 (Tenn. Ct. App. Oct. 4, 2001). In *In re Muir*, the court set forth a nonexhaustive list of actions that amounted to a significant restraint or interference with a parent's efforts to develop a relationship with a child: (1) telling a man he is not the child's biological father; (2) blocking access to the child, (3) keeping the child's whereabouts unknown; (4) vigorously resisting the parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child. *Id.* at 5 n.8 (citing *In re S.A.B.*, 735 So. 2d 523, 524 (Fla. Dist. Ct. App. 1999); *In re G.P.B., Jr.*, 736 A.2d 1277, 1286 (N.J. 1999); *Panter v. Ash*, 33 P.3d 1028, 1031 (Or. Ct. App. 2001)).

On the other hand, this Court has held that, so long as the non-custodial parent has parental rights, it is the obligation of the custodial parent, who has primary control over the child, to work to foster the relationship between the non-custodial parent and the children. *In re Z.C.G.*, No. M2000-02939-COA-R3-CV, 2001 WL 1262609, at \*7 (Tenn. Ct. App. Oct. 22, 2001). In *In re Z.C.G.*, the mother, who had custody of the parties' child, took steps to obstruct the father's visitation with the parties' son. At the time the petition for termination of his parental rights was filed, the father had not visited with the parties' child in seven months. The father claimed that his failure to visit was due in part to the mother's failure to cooperate with him. The trial court concluded that he had willfully failed to visit the child, reasoning that he did not "take the initiative and follow back up" with the mother after making an unsuccessful telephone call to the mother. At trial, the mother had admitted to being "less than co-operative in working with" the father. On those facts, the appellate court reversed the termination of the father's parental rights, determining that the mother had a responsibility to foster the relationship between the father and the child. *Id.*

In determining whether the trial court's findings of fact are supported by a preponderance of the evidence and whether those facts clearly and convincingly support a finding that Mother's failure to visit was willful, *see In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004), we adhere to the following principle of review:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App.

1998). *Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. Of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (emphasis added); *see also In re R.L.H.*, No. M2002-01179-COA-R3-JV, 2003 WL 21266732, at *6 (Tenn. Ct. App. June 3, 2003); *Powell v. Powell*, 124 S.W.3d 100, 104-05 (Tenn. Ct. App. 2003); *In re Weatherford*, No. W1999-01014-COA-R3-CV, 2000 WL 1891057, at *4 (Tenn. Ct. App. Dec. 29, 2000); *In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *8 (Tenn. Ct. App. May 26, 1999).

This Court has previously expressed its reasoning for adhering to this principle of appellate review, stating:

> One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989). Accordingly, appellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary. *See Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978); *Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996).

> The most often cited reason for this principle can be traced to the fact that trial judges, unlike appellate judges, have an opportunity to observe the manner and demeanor of the witnesses while they are testifying. *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

*Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Additionally, at this stage of the proceedings, we uphold the trial court's legitimate findings when warranted, in order to prevent a flood of appeals seeking retrial of factual issues, maintaining the proper allocation of judicial authority and avoid the duplication of effort by the courts of this state. *Id.*

Our job, however, does not end there. In light of the trial court's determinations of credibility, we must look at the aggregate of the evidence to ascertain whether its combined weight amounts to "clear and convincing" evidence. *See In re Muir*, 2003 WL 22794524, at *7 n.4. We look, then, at the facts found by the trial court and the aggregate of the evidence before the trial court to determine whether its combined weight comprises clear and convincing evidence that Mother willfully abandoned her sons.

In this case, the trial court noted that Father had abused Mother in the past, and that Stepmother's "ass whipping" remark was in fact made, but apparently concluded that Mother's

claimed fear of physical harm was not believable under the circumstances  Specifically, the court noted that no such threats were made during the statutory four-month period preceding the filing of the petition to terminate.  While Mother contacted numerous attorneys to attempt to re-establish visitation, Mother did not contact the court directly or take any other legal action to enforce her right to visit.  In addition, Mother had no contact with attorneys during the pivotal four-month period.

Apparently, Mother's efforts to talk to Father and Stepmother directly about visitation had ceased approximately two years prior to the filing of the petition.  Mother and her witnesses testified that Mother asked others, such as Nix, Honea, and Grandmother, to talk to Father and Stepmother about permitting Mother to visit her sons; this testimony was not disputed, and the trial judge did not comment directly on this testimony.  At any rate, Mother's efforts with these intermediaries were fruitless, and there was no evidence of any such efforts during the statutory four-month period.  In her testimony, Mother acknowledged that Father and Stepmother had taken no direct action to impede her visitation during the year prior to the filing of the petition.

There was no evidence of any physical abuse of Mother by Father after the parties' divorce in 1996.  By all accounts Mother visited with the children fairly regularly until either December 1998 or February 1999.  Mother's explanation of her failure to visit after that point was the threat of physical harm.  It is undisputed, of course, that Mother had not seen the children for over four years prior to the filing of the petition.

In the overall circumstances, Father's physical abuse of Mother during their marriage is relevant, since it is the backdrop for the trial court's consideration of Mother's claim of fear of physical abuse. The evidence of Father's severe abuse of Mother is very substantial.  Mother testified that Father's physical abuse of her during the marriage was frequent and brutal, and this was corroborated by the other witnesses, including Father's own mother.

As noted above, so long as the non-custodial parent has parental rights, it is the obligation of the custodial parent to work to foster the relationship between the non-custodial parent and the children.  *In re Z.C.G.*, 2001 WL 1262609, at \*7.  While "mere efforts to frustrate or discourage visitation or support do not necessarily justify" the non-custodial parent's inaction, however, such efforts justify the non-custodial parent's failure to visit or support only if they amount to a significant restraint or interference.  *See V.D. v. N.M.B.*, M2003-00186-COA-R3-CV, 2004 WL 1732323, at \*6 (Tenn. Ct. App. July 26, 2004).  Here, Mother claims that Father and Stepmother were responsible for instilling fear and intimidation in her to keep her from visiting the children, by making threats which would play on Mother's fears in the wake of Father's abuse of her during their marriage.  However, Mother admitted that neither Father nor Stepmother took any steps to prevent her visitation within the year prior to the petition for termination.

The trial court determined that Mother's claims of fear were not credible.  There is significant evidence in the record to support Mother's assertions that Father and Stepmother communicated threats to her, through third parties and by driving past her home in Alabama.  However, there is also sufficient evidence in the record to support the trial court's credibility determinations regarding

Mother's level of fear and, in turn, the trial court's finding that Mother willfully failed to visit her children. Mother testified that, following her divorce, she voluntarily gave Father full custody of Kevin. Despite the instances of physical violence during their marriage, she continued regularly to visit the children and interact with Father for approximately two years following her divorce from Father. Mother characterized Father as a good parent who provided their children with a suitable home. Mother admitted that there were no acts of violence perpetrated against her by Father following their divorce. When questioned by the trial court concerning her level of fear, Mother gave answers that were at times contradictory. Furthermore, Mother acknowledged that Father and Stepmother did nothing within the year prior to the hearing on this matter to thwart her visitation. The trial court, having heard all of the witnesses and observed them as they testified, determined that, despite the testimony supporting Mother's assertions, Mother's testimony was "unbelievable." Looking at the record as a whole, there is sufficient evidence to support this factual finding.

In light of the trial court's determinations of credibility, we must now "determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion," that is, its conclusion that Mother's failure to visit was willful. *In re Muir*, 2003 WL 22794524, at *7 n.4. Given the trial court's apparent finding that Mother was not in fact in fear for her safety during the four-month period preceding the petition, we are left with little justification for Mother's four-year failure to visit her sons. Under these circumstances, we must conclude that the combined weight of the facts constitutes clear and convincing evidence that Mother's failure to visit was willful. Therefore, we affirm the trial court's finding of grounds for termination of Mother's parental rights.

Once one of the grounds for termination has been established, we turn to the second prong under the termination statute, namely, whether termination of Mother's parental rights is in the best interest of the children. As to this prong, the trial court did not make an explicit finding that clear and convincing evidence supported the conclusion that terminating Mother's rights was in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(i). The trial court's August 19, 2003 order is silent on whether termination of Mother's rights was in the best interest of the children. The trial court's failure to enter specific findings in this regard violated the requirement in Section 36-1-113(k), which provides that "[t]he court shall enter an order which makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." Tenn. Code Ann. § 36-1-113(k) (Supp. 2004).

Moreover, the trial court's other findings are somewhat inconsistent with any implication that termination of Mother's parental rights was in the best interest of her sons. In its ruling, the trial court stated that it was "not convinced currently that adoption is in the best interest of the minor children." The trial court reasoned that Father conceded that he had committed acts of violence against Mother, and that Stepmother admittedly had made "extremely derogatory remarks" about Mother in the presence of the children, including the "ass whooping" comment. The trial court commented that it did not "morally or otherwise agree with" the decision it had made.

As noted above, the best interest of the children must also be proven by clear and convincing evidence. *See In re J.J.C.* (*State v. Calabretta*), 48 S.W.3d 919, 925 (Tenn. Ct. App. 2004); *In re M.J.B.*, 140 S.W.3d at 653. Thus, giving Mother the benefit of every controverted fact, the evidence must produce in the mind of the fact-finder a firm conviction that termination of Mother's parental rights is in the best interest of her sons. *See, Demarr*, 2003 Tenn. App. LEXIS 569, at *28; *In re A.D.A.*, 84 S.W.3d at 596. Here, the record has little evidence that termination of Mother's parental rights was in the best interest of the two boys. The evidence established that Mother had no history of substance abuse or mental illness, and that, despite little education, Mother had steady though meager employment, supporting a disabled husband. There was no evidence that the children had ever suffered ill effects from visiting with Mother. Father and Stepmother offered only their conclusory assertion that having Mother reappear in the children's lives would be unsettling to them. They proffered no evidence, from experts or otherwise, indicating that visiting with Mother and re-establishing a relationship with her after the lengthy period of time of no contact would be psychologically or emotionally damaging to the children. Mother did not seek to remove her sons from the home they shared with Father and Stepmother; she even characterized it as a "good home" for the boys despite Father's and Stepmother's actions towards her, and sought only to visit with her children, so the effect of a change of caretakers on the children appears inapplicable.

In view of the trial court's failure to enter the required specific findings on whether terminating Mother's parental rights was in the best interest of the children, we vacate the judgment terminating Mother's parental rights and remand the cause to the trial court for written findings of fact and conclusions of law in accordance with Tennessee Code Annotated § 36-1-113(k). The trial court may, in its discretion, determine whether additional proof on this issue is appropriate.

The decision of the trial court is vacated and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed half to Plaintiffs/Appellees Chirlena Jean Kleshinski and John Edward Kleshinski, and half to Defendant/Appellant Julia Elizabeth (Kleshinski) Posey, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE

**IN RE ADOPTION OF JOHN ALLEN KLESHINSKI AND
KEVIN RAY KLESHINSKI**

**CHIRLENA JEAN KLESHINSKI AND JOHN EDWARD KLESHINSKI
v.
JULIA ELIZABETH KLESHINSKI**

**An Appeal from the Chancery Court for Lincoln County
No. A-186      J. B. Cox, Chancellor**

---

**No. M2004-00986-COA-R3-CV - Filed May 4, 2005**

---

**CONCURRING OPINION**

While I concur with the decisions reached by the majority in this case, I write separately to voice my concerns regarding the manner in which the majority approaches the best interest analysis mandated by section 36-1-113(c)(2) of the Tennessee Code.

First, the majority states that, like the grounds for termination, a party seeking to terminate a biological parent's parental rights must also prove by clear and convincing evidence that doing so is in the children's best interest. I fully recognize the existence of a line of decisions rendered by this Court which would support the majority's assertion. *See In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004); *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003); *State v. Demarr*, No.

M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at *23–24 (Tenn. Ct. App. Aug. 13, 2003); *In re C.M.R.*, No. M2001-00638-COA-R3-JV, 2002 Tenn. App. LEXIS 105, at *12 (Tenn. Ct. App. Feb. 7, 2002); *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 Tenn. App. LEXIS 451, at *13 (Tenn. Ct. App. July 13, 2000).

It is apparent from reading the unambiguous language used by the legislature in section 36-1-113(c) of the Tennessee Code, however, that only one of the requirements for terminating a biological parent's parental rights requires clear and convincing proof. *See* Tenn. Code Ann. § 36-1-113(c) (2003). While I fully recognize the value of precedent, *Evans v. Steelman*, No. 01-A-01-9511-JV-00508, 1996 Tenn. App. LEXIS 625, at *20–26 (Tenn. Ct. App. Oct. 2, 1996) (Koch, J., dissenting), I simply express my concern over the imposition of a heightened standard of proof on the trial courts of this state when undertaking a best interest analysis given the language selected by the legislature. *See In re D.L.B.*, 118 S.W.3d 360, 368 (Tenn. 2003); *In re E.N.R.*, 42 S.W.3d 26, 29 (Tenn. 2001). As our supreme court has acknowledged, section 36-1-113(c) of the Tennessee Code, requires:

> [*F*]*irst* a "finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established" and *then* a finding that the "termination of the parent's or guardian's rights is in the best interests of the child[.]"

*In re D.L.B.*, 118 S.W.3d 360, 368 (Tenn. 2003) (emphasis added). Accordingly, while I agree with the majority's decision to remand this case to the trial court so that it may conduct a best interest analysis, I would not impose upon the trial court a heightened standard of proof not required by the statute.

Second, I express my concern with the manner in which the majority has chosen to remand this case to the trial court.  In *In re Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831 (Tenn. Ct. App. Nov. 25, 2003), this Court addressed a trial court's statutory duty to make specific findings of fact in parental termination cases, stating:

> A trial court's responsibility to make findings of fact and conclusions of law in termination cases differs materially from its responsibility in other civil cases.  Generally, trial courts, sitting without juries, are not required to make findings of fact or conclusions of law unless requested in accordance with Tenn. R. Civ. P. 52.01.  Termination cases, however, are another matter.  Tenn. Code Ann. § 36-1-113(k) explicitly requires trial courts to "enter an order which makes specific findings of fact and conclusions of law" in termination cases.  Thus, *trial courts must prepare and file written findings of fact and conclusions [of] law with regard to every disposition of a petition to terminate parental rights*, whether they have been requested or not.
>
> Tenn. Code Ann. § 36-1-113(k) reflects the Tennessee General Assembly's recognition of the necessity of individualized decisions in these cases.  *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999) (holding that termination cases require "individualized decision making").  It also reflects the General Assembly's understanding that findings of fact and conclusions of law facilitate appellate review and promote the just and speedy resolution of appeals.  *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990).  Because of Tenn. Code Ann. § 36-1-113(k), trial courts cannot follow the customary practice of making oral findings from the bench and later adopting them by reference in their final order.
>
> When a trial court has not complied with Tenn. Code Ann. § 36-1-113(k), *we cannot simply review the record* **de** **novo** *and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases*.  In accordance with *In re D.L.B.*, 118 S.W.3d at 365, 2003 Tenn. LEXIS 983, 2003 WL 22383609, at *6, we *must remand* the case for the preparation of appropriate written findings of fact and conclusions of law.

*In re Muir*, 2003 Tenn. App. LEXIS 831, at *8–10 (emphasis added); *see also In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

In subsequent decisions, this Court, recognizing the mandatory nature of the language found in section 36-1-113(k) of the Tennessee Code, has firmly established that, when a trial court fails to perform its statutorily required duty in parental termination cases, this Court must remand the case to the trial court for the entry of written findings of fact and conclusions of law. *See In re M.J.M.*, No. M2004-02377-COA-R3-PT, 2005 Tenn. App. LEXIS 221, at \*18–19 (Tenn. Ct. App. Apr. 14, 2005); *In re F.R.R.*, No. M2004-02208-COA-R3-PT, 2005 Tenn. App. LEXIS 130, at \*8–9 (Tenn. Ct. App. Mar. 1, 2005); *In re M.O.*, No. M2004-01602-COA-R3-PT, 2005 Tenn. App. LEXIS 125, at \*14–15 (Tenn. Ct. App. Feb. 25, 2005); *State v. C.H.K.*, 154 S.W.3d 586, 590–91 (Tenn. Ct. App. 2004); *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 Tenn. App. LEXIS 449, at \*18–19 (Tenn. Ct. App. July 13, 2004); *In re M.J.B.*, 140 S.W.3d 643, 653–54 (Tenn. Ct. App. 2004); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at \*16–17 (Tenn. Ct. App. Mar. 9, 2004); *State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 Tenn. App. LEXIS 85, at \*14–16 (Tenn. Ct. App. Feb. 9, 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 Tenn. App. LEXIS 915, at \*6–8 (Tenn. Ct. App. Dec. 23, 2003). We have also noted that the statutory requirement to prepare written findings of fact and conclusions of law applies with equal force to the best interest component of parental termination cases. *See White v. Moody*, No. M2004-01295-COA-R3-PT, 2004 Tenn. App. LEXIS 890, at \*8 (Tenn. Ct. App. Dec. 30, 2004) (noting that, when handling a parental termination case for the third time on appeal, this Court had previously remanded the case to the trial court due to its failure to enter written findings of fact and conclusions of law on the best interest factors); *In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 Tenn. App. LEXIS 804, at \*12 (Tenn. Ct. App. Nov. 13, 2003) ("The findings of fact and conclusions of law required by Tenn. Code Ann. § 36-1-113(k)

-4-

must address the two necessary elements of every termination case.").

In ***White v. Moody***, No. M2004-01295-COA-R3-PT, 2004 Tenn. App. LEXIS 890 (Tenn.

Ct. App. Dec. 30, 2004), ***cert. denied***, 2005 Tenn. LEXIS 265 (Tenn. 2005), this Court had before

it a parental termination case for the third time on appeal. ***White***, 2004 Tenn. App. LEXIS 890, at

*1. In the original appeal, this Court affirmed the trial court's findings regarding the grounds for

termination, but, regarding the best interest analysis, we stated:

> We noted that the trial court had failed to make a specific finding that
> terminating Mr. Moody's parental rights was in Nicole's best
> interests. *Accordingly, we remand the case to the trial court with
> directions to conduct a hearing regarding whether terminating Mr.
> Moody's parental rights was in Nicole's best interests.*

***Id***. at *8 (emphasis added). Not only did this Court remand so that the trial court could comply with

the requirements of section 36-1-113(k) of the Tennessee Code, but we directed the trial court to

conduct a new hearing on remand. ***Id***.

Regarding the actions taken by the trial court on remand, this Court stated:

> The trial court conducted two days of hearings in November
> 2001 and March 2002 to determine whether terminating Mr. Moody's
> parental rights was in Nicole's best interests. During this hearing, the
> trial court limited its consideration to the original record and declined
> to permit the parties to introduce new evidence regarding events
> occurring after March 2000. Ultimately, in April 2002, the trial court
> entered a second order concluding that terminating Mr. Moody's
> parental rights was in Nicole's best interests. Mr. Moody appealed
> again. On July 25, 2003, *we again vacated the judgment terminating
> Mr. Moody's parental rights after concluding that the parties should
> have been permitted to present evidence regarding Nicole's best
> interest.*

*Id.* at \*9 (emphasis added). After the trial court conducted another hearing involving new evidence and entered its third order, the case came before this Court for the third time on appeal. *Id.* at \*10–11. After recognizing a trial court's duty to enter written findings of fact and conclusions of law in parental termination cases, this Court "determined that this case should not be remanded for the entry of written findings of fact and conclusions of law because of the inordinate delay that has already occurred in the final disposition of this case." *Id.* at \*11.

The aforementioned cases have firmly established that it is the trial court, not this Court, which must conduct the best interest analysis mandated by section 36-1-113(c)(2) of the Tennessee Code. Thus, it is apparent that, if a trial court does not conduct a best interest analysis in a parental termination case, this Court must vacate the trial court's order and remand the case to the trial court with instructions that it comply with its statutorily required duty. We must also instruct the trial court that, in conducting a best interest analysis, it must enter written findings of fact and conclusions of law in accordance with section 36-1-113(k) of the Tennessee Code. Furthermore, on remand, the trial court may, as the majority correctly notes, conduct a new hearing and entertain new evidence to enable it to reach a decision on the best interest issue.

In this case, however, the majority has gone further and commented on the evidence, or lack thereof, presented during the initial hearing. Not only is doing so totally unnecessary given the trial court's ability to conduct an entirely *de novo* hearing on remand, but it also gives the impression of

attempting to steer the trial court to reach a particular conclusion.[1] It is a firmly established principle of appellate jurisprudence that the appellate courts will not issue advisory opinions on issues which must be remanded to the trial court for further action. In a concurring opinion authored by Justice Brock of the Tennessee Supreme Court he stated: "But it is my view that such opinion should be limited to a statement of the reasons for refusal to take jurisdiction of the merits of the case; anything more is dictum and amounts to an advisory opinion which we are not authorized to give." *Pairamore v. Pairamore*, 547 S.W.2d 545, 550 (Tenn. 1977) (Brock, J., concurring) (citing *Crane Enamelware Co. v. Smith*, 76 S.W.2d 644 (Tenn. 1934); *Reed v. Rhea County*, 225 S.W.2d 49 (Tenn. 1949)); *see also Nichols v. State*, 90 S.W.3d 576, 607 (Tenn. 2002); *State v. Brown & Williamson Tobacco Corp*., 18 S.W.3d 186, 193 (Tenn. 2000); *Tweed v. Kiser*, No. E2003-02923-COA-R3-CV, 2004 Tenn. App. LEXIS 682, at *12–13 (Tenn. Ct. App. Oct. 19, 2004); *State v. Ward*, 138 S.W.3d 245, 272 (Tenn. Crim. App. 2003); *Johnson v. City of Clarksville*, No. M2001-002273-COA-R3-CV, 2003 Tenn. App. LEXIS 413, at *12 (Tenn. Ct. App. June 3, 2003); *Winkler v. Tipton County Bd. of Educ.*, 63 S.W.3d 376, 384 (Tenn. Ct. App. 2001); *Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9-CV, 2001 Tenn. App. LEXIS 224, 38–39 (Tenn. Ct. App. Apr. 5, 2001); *J.C. Bradford & Co. v. S. Realty Partners*, No. W1999-01617-COA-R3-CV, 2000 Tenn. App. LEXIS 555, at *31 (Tenn. Ct. App. Aug. 14, 2000).

Accordingly, I would simply vacate the trial court's order and remand this case to the trial

---

[1]The majority makes the following comments on the evidence pertaining to the best interest analysis: "the trial court's other findings are somewhat inconsistent with any implication that termination was in the best interest of her sons"; "the record has little evidence that termination of Mother's parental rights was in the best interest of the two boys"; [t]here was no evidence that the children had ever suffered ill effects from visiting with Mother"; "so the effect of a change of caretakers on the children appears inapplicable."

court with the following limited instructions: (1) conduct the statutorily required best interest analysis; (2) if the trial court determines that the record in its present form prevents the court from conducting a best interest analysis, then the trial court may conduct a new hearing and entertain additional evidence to aid it in this endeavor; and (3) when rendering its decision, the trial court should enter specific written findings of fact and conclusions of law.